## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| DOUG SALMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-04093-CV-C-NKL |
| | ) | |
| CENTRAL ELECTRIC | ) | |
| MANUFACTURING COMPANY and | ) | |
| AZZ CENTRAL, INC. and AZZ, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On May 2, 2006, Plaintiff Doug Salmons ("Salmons") filed a Complaint in which he alleges that Defendants Central Electric Manufacturing Company ("CEM"), AZZ Central, Inc., and AZZ, Inc. ("AZZ"), wrongfully terminated his employment and retaliated against him because he supported a co-worker's lawsuit against them. Pending before the Court is Defendants CEM and AZZ's (collectively, "the Company") Motion for Summary Judgment [Doc. # 24] and Salmons's Motion to Strike Exhibits [Doc. # 30]. For the reasons stated herein the Company's Motion for Summary Judgment is granted and Salmons's Motion to Strike Exhibits is denied as moot.

### SALMONS'S MOTION TO STRIKE EXHIBITS

Salmons has moved the Court to strike Exhibits 8 and 10-16 to the Company's Motion for Summary Judgment. In ruling on the Company's Motion for Summary

1

Judgment (below), the Court did not consider any of the information contained in Exhibit 8 or Exhibits 10-16. Therefore, Salmons's Motion to Strike Exhibits is denied as moot.

## THE COMPANY'S MOTION FOR SUMMARY JUDGMENT

### I.     Facts

The following facts are viewed in the light most favorable to Salmons who is the non-movant.

CEM is a manufacturer of electrical switchgear for the distribution of electrical power within industrial and commercial facilities. CEM distributes a policy manual to its employees. The manual includes CEM's practices with respect to CEM's scrap metal. Specifically, the policy states, "[s]crap materials or metals of any size or shape shall not be removed from the premises without the permission of a supervisor." (Defs' SOF, ¶ 4). CEM's Employee Conduct Policy sets forth their rules, which if breached, can lead to discipline of the employee. Such discipline may include the employee's termination. One of CEM's rules prohibits the theft of CEM's property. Throughout his employment, Salmons received the most recent versions of CEM's policies and procedures.

Salmons began working at CEM on February 24, 1975. Prior to August 1998, CEM promoted Salmons to Fabrication Crew Leader. As Fabrication Crew Leader, Salmons was responsible for supervising and assisting in the fabrication, building and welding of switchgears and power centers. Prior to September 27, 2001, Salmons worked on a fabrication crew with Christina Frosch. Frosch was transferred to a different fabrication crew on September 27, 2001.

On or about February 26, 2002, Frosch complained to CEM Supervisor Bill Hoffman about alleged sexual harassment at CEM. The next day, Salmons was interviewed about his knowledge of Frosch's complaint. Less than two weeks later, on March 5, 2002, Frosch filed a Charge of Discrimination with the Missouri Commission on Human Rights. On that same day, Salmons was again interviewed about Frosch's claims. One of his interviewers on that day was Bob Ruffin, CEM's Vice President of Human Relations. Frosch ultimately resigned from CEM on September 12, 2002. The following January, Frosch filed suit against the Company; in February 2003, legal counsel for the Company interviewed Salmons regarding his knowledge of Frosch's claims.[1] Frosch's lawsuit was resolved in late 2003 or early 2004. Salmons was never deposed in connection with her claims.

With respect to the investigation into Frosch's claims, Salmons testified at his deposition as follows:

> Q: You say, "After I refused to lie for CEM"– who asked you to lie?
>
> A: They didn't come right out and tell me to lie, they just – just kind of leaned the way I – wanted me to lean the way they wanted me to lean.
>
> Q: So no one asked you to lie?
>
> A: Not right out say lie, no.
>
> Q: What do you base that statement upon?
>
> A: On what Bob Ruffin told me when he met with me.

---

[1] Neither party has presented any evidence, or even suggested, that Frosch accused Salmons of any untoward conduct.

> Q: And what was that?
>
> A: Said that he could get nasty if he had to.
>
> Q: What did you think he meant by that?
>
> A: I think he meant maybe he could get my job if it come to that.
>
> Q: Did you ask him if he meant that?
>
> A: No. I didn't ask him nothing.

(Salmons Depo. p.232:2-17).

On February 17, 2003, CEM conducted its yearly performance review of Salmons. Salmons received an overall rating of 26 out of a possible 32. A few weeks later, CEM awarded Salmons a general wage increase from $15.98 per hour to $16.10 per hour.

On February 24, 2004, CEM again conducted a yearly performance review of Salmons. This time, he was given an overall rating of 27 out of a possible 32, which is a more complimentary review than Salmons received in the previous years. As in 2003, Salmons received a pay increase after his review. Salmons's wage increased from $16.20 per hour to $16.36 per hour. On February 21, 2005, Salmons's wage was again increased, this time from $16.36 per hour to $16.52 per hour.

Salmons's employment was terminated on February 23, 2005. At that time, CEM's policy with regard to employee use of scrap metal required any employee wishing to use scrap metal for personal use to first obtain permission from a supervisor to purchase the scrap metal. CEM also required employees to obtain permission from a supervisor prior to using CEM's machinery to manipulate the metal. CEM's practice was

4

to terminate any employee who removed its property from the buildings without advance approval from a supervisor.

On February 23, 2005, Salmons took CEM's scrap metal, used CEM's machinery to manipulate the metal, removed the metal from CEM's building and placed the metal in his vehicle. Salmons did not seek supervisory approval for these acts. When it learned of Salmons's acts, CEM terminated his employment. CEM never investigated whether Salmons intended to get a supervisor's approval of his actions.

At his deposition, supervisor Bill Hoffman testified that CEM never investigated whether Salmons intended to get a supervisor's approval of his actions. In addition, Hoffman was asked whether a supervisor could have approved Salmons's taking of the scrap metal even after Salmons had put the metal in his vehicle. Hoffman responded, "Probably, yes, sir." Hoffman also testified that he was not aware of anyone ever receiving permission to take possession of CEM's scrap metal after the individual had already placed it in his vehicle.

## II.  Discussion

Salmons's Complaint asserts three claims against the Defendants: wrongful discharge against public policy of the State of Missouri (Count I); retaliation in violation of Title VII (Count II); and retaliation in violation of the Missouri Human Rights Act (Count III). Like Counts II and III, Salmons's wrongful discharge claim alleges that the Company retaliated against him for engaging in protected conduct; to wit: participating in the investigation into Frosch's sexual harassment claims.

5

### A. Salmons's Title VII and Missouri Human Rights Act Claims

"Title VII prohibits retaliation against an employee who files charges of discrimination or assists others in opposing discrimination." *Thompson v. Bi-State Development Agency*, 463 F.3d 821, 825-26 (8th Cir. 2006). Absent direct evidence of retaliation, the Court addresses Salmons's Title VII and Missouri Human Rights Act[2] retaliation claims by applying the familiar *McDonnell Douglas* three-part burden-shifting analysis. *Id.* at 826.

#### 1. Direct Evidence

Direct evidence is evidence that links the alleged discriminatory attitude and the adverse employment action in such a way that a reasonable fact finder could conclude "that an illegitimate criterion actually motivated the adverse employment action." *Griffith*, 387 F.3d at 736 ("'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."); *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Some comments can reflect a decision maker's discriminatory attitude while still not supporting an inference that the decision maker's discriminatory attitude caused an adverse employment action. *Browning v. President Riverboat Casino-Missouri*, 139 F.3d 631, 635 (8th Cir. 1998) ("Direct evidence does not include stray

---

[2] It is well settled that claims under the Missouri Human Rights Act may be evaluated using the same framework as claims brought under Title VII. *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir. 1995).

remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." (quotation omitted)).

In this case, Salmons argues that he "can show direct and circumstantial evidence that his participation in the lawsuit of co-worker Tina Frosch was causally linked to the termination of his employment." (Doc. 31 at 13). Specifically, Salmons cites the following as evidence of the causal connection:

> Other employees noted the difference in CEM's treatment of Plaintiff after his involvement in the Frosch claim and Plaintiff received wage increases less than other employees after the claim. Additionally, plaintiff was warned that such would be the case when he was pressured to lie about what he knew about Ms. Frosch's case. Circumstantially, other employees were given scrap items for no charge and allowed to make elaborate items on company time, but Plaintiff was not even investigated regarding his intentions with the scrap he possessed, even though he had informed another employee prior to taking the item to his vehicle that he planned to report the item to a supervisor and supervisors could approve such items after they had been placed in the car.

(Doc. 31 at 13) (citations to the record omitted).

None of the evidence Salmons cites constitutes direct evidence that his employment was terminated in retaliation for his participation in Frosch's lawsuit. First, the only evidence that other employees noted a difference in CEM's treatment of Salmons after his involvement with the lawsuit is Steward's deposition testimony that management was "picking on" Salmons. Steward, however, testified that he could not cite a single example illustrating what he meant. Second, Salmons's claim that he received wage increases less than other employees after his involvement with Frosch's lawsuit is supported only by Salmons's own deposition testimony. Neither of these points could be

7

considered direct evidence that Salmons was fired as a result of his involvement with Frosch's lawsuit. Similarly, Salmons has not established that any pressure placed on him to lie in conjunction with Frosch's lawsuit directly relates to his discharge. He has only established that he thinks a direct connection exists between his participation in Frosch's lawsuit and his subsequent termination. Salmons correctly identifies the remaining items in the above-quoted paragraph as circumstantial. As such, they do not constitute direct evidence that Salmons was discharged in retaliation for his involvement in Frosch's lawsuit.

## 2. The *McDonnell Douglas* Test

Because Salmons has not submitted direct evidence linking his protected conduct with his discharge, Salmons's Title VII and Missouri Human Rights Act retaliation claims are evaluated under the *McDonnell Douglas* three-step burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, a plaintiff must first make out a prima facie case. Once a plaintiff has made a prima facie case, there is a presumption of retaliatory conduct by the employer. The employer may shift the burden of production back to the plaintiff by presenting a legitimate, non-discriminatory reason for its conduct. *Haas v. Kelly Services, Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citations omitted) (setting forth the burden-shifting framework). If the employer satisfies its burden of production, then the presumption of unlawful conduct disappears and the plaintiff is required to prove by a preponderance of

the evidence that the employer's stated reason was pretext for unlawful conduct creating an inference that discrimination was the true reason. *Haas*, 409 F.3d at 1035.

After the Supreme Court's decision in *Burlington Northern*, to establish a retaliation claim, Salmons must show (1) he engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). The Company argues that Salmons cannot meet his prima facie burden.

Even assuming Salmons has met his prima facie burden, the Company has articulated a legitimate, non-discriminatory reason for Salmons's discharge: violation of CEM's policy. Thus, Salmons must put forth admissible evidence that the Company's stated reason for firing him is pretext for unlawful discrimination.

Salmons submits the following evidence in support of his argument that his discharge was pretextual: (1) Steward's testimony that management was "picking on" Salmons; (2) Salmons's testimony that his wage increases were less than those of other employees; (3) Salmons's testimony that he was told by Ruffin that Ruffin "could get nasty if he had to" in conjunction with Ruffin pressuring Salmons to lie regarding Frosch's claims; (4) evidence that other employees were given scrap items for no charge and allowed to make elaborate items on company time; and (5) evidence that Salmons was not investigated regarding his intentions with the scrap he possessed, even though he had informed another employee prior to taking the item to his vehicle that he planned to

report the item to a supervisor and supervisors could approve such items after they had been placed in the car.

First, Steward was unable to provide a single example of management "picking on" Salmons. Second, other than his own testimony, Salmons has presented no evidence that his wage increases were less than those of other employees. Third, Salmons has presented no evidence, other than his own intuition, that Ruffin's comment at their March 5, 2002 meeting that he "could get nasty if he had to" meant that Salmons would be fired if he did not "lean the way [the Company] wanted [him] to lean" with respect to Frosch's allegations. Fourth, the Company does not dispute that other employees were given scrap items for no charge and allowed to make elaborate items on CEM's time. The Company, however, has submitted evidence that supervisor approval is required before an employee may use scrap items for personal use. Salmons has submitted no evidence that the Company's position is untrue. Fifth, Salmons has submitted no evidence that he was entitled to an investigation regarding his intentions with the scrap metal. He has not shown that other employees in similar circumstances were investigated before being terminated. The fact that no investigation was conducted does not mean he was discharged for a reason other than his violation of the Company's scrap metal policy. Finally, Salmons's contention that supervisors could approve an employee's taking of scrap metal after the metal had been placed in the employee's car is based solely on Hoffman's speculation that the taking of a piece of metal "probably" could be approved after the employee already put the metal in his car. Hoffman also testified that he was not

10

aware of any employee who received post-possession approval to take scrap metal from CEM. Absent evidence that other employees were allowed to seek approval to take scrap metal after they had already taken it, speculation that employees "probably" could do so is insufficient to suggest that the Company's stated reason for terminating Salmons is pretextual.

For its part, the Company has submitted evidence that Salmons was interviewed regarding Frosch's claims on February 27 and March 5, 2002 and sometime during February 2003. The Company has also submitted evidence that "Frosch's lawsuit was ultimately resolved before Mr. Salmons was deposed and without Mr. Salmons's participation in any additional interviews or investigation." (Defs' SOF, ¶ 35). Salmons has submitted no evidence that he participated in Frosch's lawsuit after his February 2003 interview. The Eighth Circuit has held that as little as a four-week interval between a plaintiff's protected conduct and the adverse employment action is insufficient to establish a causal connection between the two. *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 851-52 (8th Cir. 2005); *see also Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (stating on the facts of the case that "[w]ith [a] lengthy delay [of ten months], any causal nexus inference tends to evaporate"). In this case, Salmons's involvement with Frosch's lawsuit occurred two years prior to his termination.

In light of the uncontroverted evidence that Salmons violated CEM's policy and the two-year gap between his protected conduct and his discharge, the Court finds that Salmons has not presented evidence sufficient to create a triable issue on the question of

11

pretext or to create a reasonable inference that his involvement with Frosch's lawsuit bears any causal relationship to his employment's termination. Therefore, the Company's Motion for Summary Judgment is granted as to Counts II and III.

### B. Salmons's Wrongful Discharge Against Public Policy Claim

Under Missouri law, to prove wrongful discharge in violation of public policy, a plaintiff must establish an exclusive causal relationship between the discharge and the allegation of violation of public policy. *Lynch v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147, 151-52 (Mo. Ct. App. 1995). As discussed in the previous section, Salmons has not established a causal relationship between his involvement in Frosch's lawsuit and his discharge. Therefore, the Company's Motion for Summary Judgement is granted as to Count I.

## III. Conclusion

Accordingly, it is hereby

ORDERED that the Company's Motion for Summary Judgment [Doc. # 24] is GRANTED and Salmons's Motion to Strike Exhibits [Doc. # 30] is DENIED AS MOOT.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: July 9, 2007
Jefferson City, Missouri